UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

GLEN WARREN DARBY                    DOCKET NO. 6:13-cv-01762

VERSUS                               JUDGE DOHERTY

U.S. COMMISSIONER, SOCIAL            MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION


## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further consideration consistent with this report and recommendation.

### BACKGROUND

The claimant, Glen Warren Darby, was born on August 23, 1963.[1]  On March

29, 2011, when he was forty-seven years old, Mr. Darby applied for a period of

disability, disability insurance benefits, and Supplemental Security Income benefits,

alleging a disability onset date of December 30, 2010[2] due to heart problems, high

---

[1]      Rec. Doc. 6-1 at 147, 153.

[2]      Rec. Doc. 6-1 at 147, 153.

blood pressure, and high cholesterol.[3]  Mr. Darby has a high school equivalency diploma or GED[4] and has not worked since December 30, 2010.[5]  Prior to that date, however, Mr. Darby worked as a lead man in a dairy, as a plant manager for a beauty supply manufacturer, and as a scaffold builder for construction companies.[6]

The claimant has had longstanding heart disease.  According to a history given to his primary care physician, Mr. Darby had stents placed in his coronary arteries in June 2007 and again in August 2007.[7]  He may have had stents placed as early as 2004.[8]  The record also contains a reference to a possible stent placement in 2009.[9]

On June 25, 2010, Mr. Darby saw his primary care physician, Dr. David B. Ware.[10]  Mr. Darby denied chest pain or shortness of breath but complained of fatigue, which Dr. Ware attributed to his severe obstructive sleep apnea.  Dr. Ware also diagnosed hypertension, hyper-cholesterol, and coronary artery disease.

---

[3]     Rec. Doc. 6-1 at 184.

[4]     Rec. Doc. 6-1 at 42.

[5]     Rec. Doc. 6-1 at 42.

[6]     Rec. Doc. 6-1 at 201.

[7]     Rec. Doc. 6-2 at 3, 37-38.

[8]     Rec. Doc. 6-2 at 131.

[9]     Rec. Doc. 6-1 at 41.

[10]     Rec. Doc. 6-2 at 188.

On October 21, 2010,[11] a stress echocardiogram was performed at University Medical Center in Lafayette, Louisiana.  The test was stopped because of fatigue but it was negative for ischemia and was interpreted to be a normal exam.  "Myocardial ischemia occurs when blood flow to your heart muscle is decreased by a partial or complete blockage of your heart's arteries (coronary arteries)."[12]

Just a month later, on November 17, 2010, Mr. Darby was again seen at University Medical Center and selective coronary angiography was performed.[13]

A month after that, on December 10, 2010, Mr. Darby had an outpatient consultation at the Cardiothoracic Surgery Clinic at the Medical Center of Louisiana in New Orleans.[14]  The history he gave at that time indicated that the previous August he had begun having unstable angina with nocturnal pain and pain with exertion during the day.  He had undergone cardiac catheterization the previous August and was found to have severe two-vessel coronary disease with in-stent stenosis of the stent that was placed in 2007.  He was referred for coronary bypass surgery, which was scheduled for January 4, 2011.

---

[11]      Rec. Doc. 6-2 at 25.

[12]      Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/basics/definition/con-20035096 (last visited June 26, 2015).

[13]      Rec. Doc. 6-2 at 23-24.

[14]      Rec. Doc. 6-2 at 37-38.

Mr. Darby underwent coronary artery bypass surgery on January 4, 2011.[15] Instead of the expected triple bypass, however, he underwent a quadruple bypass. Four weeks later, it was noted that he was doing well and would be followed by his primary care physician.[16]

Just two months after the bypass surgery, on March 10, 2011, Mr. Darby was seen at the Cardiology Center at University Medical Center.[17]  He complained of pain in his left leg, chest pain under his left arm, and soreness in his underarm area as well as decreased strength in his left arm, coldness, and dizziness on getting up, the last three symptoms having been experienced since the recent surgery.

Two months after that, on May 12, 2011, Mr. Darby was again seen at the Cardiology Clinic at University Medical Center.[18]  He was experiencing "on and off" palpitations, shortness of breath, and hot flashes and had experienced pain in his teeth for about three weeks.  His hypertension was not at goal, and he was diagnosed with anxiety, high cholesterol, hypertension, and coronary artery disease.

---

[15]     Rec. Doc. 6-2 at 39-42.

[16]     Rec. Doc. 6-2 at 48.

[17]     Rec. Doc. 6-2 at 71.

[18]     Rec. Doc. 6-2 at 68-70.

-4-

A nuclear stress test was performed on June 7, 2011 because of chest pain complaints.[19]  The test showed reversible ischemia involving the anterior wall and a mildly low ejection fraction of 48%.[20]

On July 7, 2011, clinical psychologist Dr. David E. Greenway, evaluated Mr. Darby at the request of Disability Determination Services and prepared a psychological report.[21]  He found that Mr. Darby has a mild adjustment disorder with depression.

On September 1, 2011, Mr. Darby was again seen in the Cardiology Clinic at University Medical Center.[22]  Although he did not complain about chest pain, he did complain of intermittent pain in his teeth and left arm once or twice per week.

Another catheterization of his heart, also referred to as selective coronary angiography, was performed at University Medical Center on September 21, 2011.[23]

Less than two months later, on November 8, 2011, Mr. Darby underwent yet another cardiac catheterization at Medical Center of Louisiana in New Orleans.[24]  The

---

[19]    Rec. Doc. 6-2 at 79.

[20]    Rec. Doc. 6-2 at 105.

[21]    Rec. Doc. 6-2 at 108-110.

[22]    Rec. Doc. 6-2 at 131.

[23]    Rec. Doc. 6-2 at 122, 125-127; Rec. Doc. 6-3 at 8-9.

[24]    Rec. Doc. 6-3 at 34-36.

procedure was performed because the coronary angiogram previously performed at University Medical Center "found [Mr. Darby] with atretic LIMA, totally occluded SVG to diagonal, patent SVG to OM1 and OM2, and [he] was sent for evaluation of the disease in the LAD and left circumflex." The procedure confirmed total occlusion of a coronary artery, and a stent was placed in the artery.

Mr. Darby followed up with Dr. Ware, his primary care physician, on November 15, 2011.[25]  Dr. Ware noted that Mr. Darby had undergone quadruple bypass surgery in January and had had a stent put in approximately one week before this visit. Mr. Darby did not complain of chest pain or shortness of breath, but he did complain of numbness in his arm, dizziness when moving, and having trouble reading. Dr. Ware noted that Mr. Darby's coronary artery disease is "fairly aggressive in nature" and that he "has required multiple intervention (restenosis)." An EKG was performed, which was within normal limits. Dr. Ware also diagnosed dizziness and severe obstructive sleep apnea.

On January 10, 2012, Mr. Darby was seen at the Cardiovascular Institute of the South.[26]  He complained of dizziness, increased shortness of breath on exertion, intermittent episodes of hot flashes, and periodic chest discomfort as well as back

---

[25]      Rec. Doc. 6-2 at 190.

[26]      Rec. Doc. 6-2 at 145-146.

pain radiating to his left leg with numbness and tingling.  The diagnoses were coronary artery disease, hypertension, and dyslipodemia.

A week later, Mr. Darby saw cardiologist Dr. Veerina at the Cardiovascular Institute of the South on January 16, 2012,  The records from that visit are confusing. First, there is a note indicating that a scheduled stress test was canceled because Mr. Darby's blood pressure was too high at 162/108.[27] Second, there is a report indicating that a stress test was performed, which showed a normal EKG, good functional capacity, and normal heart recovery rate; however, the test was terminated because of dyspnea or labored breathing.[28]  Perhaps the test scheduled for early in the day was rescheduled and conducted later on the same day.

Mr. Darby followed up at Cardiovascular Institute of the South in Opelousas, Louisiana the next month, on February 17, 2012.[29]  The treatment notes indicate that Mr. Darby complained of discomfort to his chest and shortness of breath, which were relieved by nitroglycerin.  Less than two weeks later, on February 29, 2012, Mr. Darby was seen in the cardiology department at Opelousas General Health System.[30]

---

[27]     Rec. Doc. 6-2 at 172.

[28]     Rec. Doc. 6-2 at 175.

[29]     Rec. Doc. 6-3 at 87-90.

[30]     Rec. Doc. 6-3 at 48.

His chief complaint was chest pain.  A transthoracic echocardiogram was performed.[31]

On March 7, 2012,[32] Mr. Darby was admitted to Cardiovascular Institute of the South with an admitting diagnosis of angina and coronary artery disease.  Left heart catheterization was performed with saphenous vein graft and internal mammary angiography and complex percutaneous coronary interventions (stent placements) in the left anterior descending artery and circumflex.  He was discharged from the hospital the next day.

On March 23, 2012, an MRI of Mr. Darby's lumbar spine was performed, which showed spondylitic changes at L5-S1.[33]  Mr. Darby met with a nurse practitioner in Dr. Ware's office on April 3, 2012 to receive the results of the MRI.  Her notes indicate that the pain from the lumbar spondylosis can be controlled with Lortab, but Mr. Darby does not want to take that medication long term.  Therefore, he was being referred to Dr. Fatheree for possible epidural injections.[34]

---

[31]     Rec. Doc. 6-3 at 68-80.

[32]     Rec. Doc. 6-3 at 49-55

[33]     Rec. Doc. 6-3 at 58.

[34]     Rec. Doc. 6-3 at 59.

On April 11, 2012, Mr. Darby saw Dr. Veerina at Cardiovascular Institute of the South, complaining of stabbing chest pains.[35]

On April 18, 2012, Mr. Darby was admitted to the Cardiovascular Institute of the South's hospital in Opelousas, Louisiana.[36] He was discharged the next day. The admitting diagnoses were angina, dyspnea, and coronary artery disease. It is not clear what procedure was performed, but it involved an incision in the right groin, so it may have been another heart catheterization.

Thus, between 2007 and mid-2012, Mr. Darby underwent at least five – and perhaps as many as seven – heart catheterizations and a quadruple bypass operation for his severe coronary artery disease, but he continued to complain of chest pain.

On October 12, 2011, it was determined that Mr. Darby is not disabled.[37] Mr. Darby requested a hearing,[38] which was held on April 10, 2012 before Administrative Law Judge ("ALJ") Rowena DeLoach.[39]

At the hearing, Mr. Darby testified that he experiences some type of chest discomfort or pain on a daily basis. When the pain increases to a certain level, about

[35]     Rec. Doc. 6-3 at 104.

[36]     Rec. Doc. 6-3 at 62-66.

[37]     Rec. Doc. 6-1 at 90, 101.

[38]     Rec. Doc. 6-1 at 110.

[39]     Rec. Doc. 6-1 at 37-78.

-9-

twice a month, he takes nitroglycerin, which controls the pain but leaves him with a headache.  He also takes a medication that causes dizziness and headaches.  He complained of shortness of breath, fatigue, stress, and anxiety.  He also has back pain that radiates down his leg and causes him to fall.  He was scheduled to see a neurologist with regard to that condition shortly after the hearing.  His brother died at age 48 due to a massive heart attack and his sister died at age 53 due to a heart condition.

The ALJ rendered an unfavorable decision on June 25, 2012.[40]  The claimant requested review of the ALJ's ruling, but the Appeals Council denied review.[41]  Accordingly, the ALJ's decision is the Commissioner's final decision for purposes of judicial review.[42]  The claimant now argues that his heart condition, lumbar spondylosis, diabetes mellitus, and obstructive sleep apnea are disabling.

## ASSIGNMENT OF ERRORS

The claimant argues that the Commissioner's ruling is erroneous for four reasons:  (1) because the ALJ found that Mr. Darby can perform the full range of light work; (2) because the ALJ found that Mr. Darby's adjustment disorder is not severe;

---

[40]    Rec. Doc. 6-1 at 18-27.

[41]    Rec. Doc. 6-1 at 6.

[42]    42 U.S.C. § 405(g).

(3) because the ALJ found that Mr. Darby can sustain work-related activities; (4) because the ALJ failed to consider Mr. Darby's non-severe impairments as well as his severe impairments; and (5) because the ALJ relied on a vocational expert to establish, at Step Four of the prescribed analysis, that Mr. Darby can return to his prior relevant work.

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to determining whether the decision was supported by substantial evidence and whether the proper legal standards were applied in reaching the decision.[43]  If the Commissioner's findings are supported by substantial evidence and the decision comports with relevant law, the decision must be affirmed.[44]  Substantial evidence is more than a mere scintilla and less than a preponderance.[45]  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.[46]  Finding substantial evidence does not involve a search of the record for isolated bits of evidence that support the Commissioner's decision; instead, the entire

---

[43]     42 U.S.C. § 405(g); *Alfred v. Barnhart*, 181 Fed. App'x 447, 449 (5th Cir. 2006); *Boyd v. Apfel,* 239 F.3d at 704.

[44]     *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[45]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

[46]     *Boyd v. Apfel,* 239 F.3d at 704.

record must be scrutinized as a whole.[47]  The court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.[48]

A claimant seeking Social Security benefits bears the burden of proving that he is disabled.[49]  Disability is defined in the Social Security regulations as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[50]  Substantial gainful activity is defined as work activity that involves doing significant physical or mental activities for pay or profit.[51]

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  At step one, an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.  At step two, an individual who does not have a severe impairment will be found not disabled.  At step three, an individual who meets or equals an impairment listed in the

---

[47]     *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

[48]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

[49]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992); *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987).

[50]     42 U.S.C. § 423(d)(1)(A).

[51]     20 C.F.R. § 404.1572.

-12-

regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.  At step four, an individual found capable of performing the work he has done in the past will be found not disabled.  At step five, factors including age, education, past work experience, and residual functional capacity must be considered to determine if the claimant can perform any work other than the work he has done in the past.[52]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[53] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the claimant's record.[54]  The claimant's residual functional capacity is used at the fourth step to determine if the claimant can still do his past relevant work, and it is used at the fifth step to determine whether the claimant can adjust to any other type of work.[55]

---

[52]     See, e.g., *Wren v. Sullivan*, 925 F.2d 123, 125 (5ᵗʰ Cir. 1991), summarizing 20 C.F.R. § 404.1520(b)-(f).  See, also, *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5ᵗʰ Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5ᵗʰ Cir. 2000).

[53]     20 C.F.R. § 404.1520(a)(4).

[54]     20 C.F.R. § 404.1545(a)(1).

[55]     20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps.[56]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[57]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[58]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[59]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[60]

In this case, the Commissioner found, at step one, that Mr. Darby has not engaged in substantial gainful activity since December 30, 2010, the date on which his disability allegedly began.[61]  This finding is supported by evidence in the record.

---

[56]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[57]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[58]      *Fraga v. Bowen*, 810 F.2d at 1304.

[59]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[60]      *Anthony v. Sullivan*, 954 F.2d at 293, citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[61]      Rec. Doc. 6-1 at 20.

-14-

At step two, the ALJ found that Mr. Darby has the following severe impairments:  coronary artery disease, lumbar spondylosis, hypertension, diabetes mellitus, and obstructive sleep apnea.[62]  This finding is supported by evidence in the record.

At step three, the ALJ found that Mr. Darby does not have an impairment or a combination of impairments that meets or medically equals a listed impairment.[63]  Mr. Darby challenges this finding.

At the next step of the process, the ALJ found that Mr. Darby retains the residual functional capacity to perform the full range of light work.[64]  Mr. Darby objects to this finding.

At step four, the ALJ found that Mr. Darby is capable of performing his past relevant work as a freezer operator and factory manager, as those jobs are performed in the national economy.[65]  Mr. Darby disputes this finding.

## DISCUSSION

### A.    DOES THE CLAIMANT'S HEART DISEASE MEET A LISTING?

---

[62]        Rec. Doc. 6-1 at 21.

[63]        Rec. Doc. 6-1 at 22.

[64]        Rec. Doc. 6-1 at 22.

[65]        Rec. Doc. 6-1 at 26.

The ALJ found that Mr. Darby has severe coronary artery disease.  That finding is supported by the evidence in the record.  However, the ALJ also found that Mr. Darby's coronary artery disease does not meet or medically equal a listed impairment. In reaching this conclusion, the ALJ failed to identify the listings considered – making a blanket reference to "the criteria of sections 1.00, *et seq*., and 4.00, *et*. [sic] *seq*., in general, of the Listings of Impairment."[66]  She also reached that conclusion without comparing any of Mr. Darby's symptoms or clinical findings with the criteria of any particular listing.  This was error, which mandates remand of this matter.

An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[67]  More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[68]

In *Audler v. Astrue*, the ALJ, at step three of the analysis, summarily concluded that the medical evidence in the record indicated that the claimant had impairments

---

[66]     Rec. Doc. 6-1 at 22 (emphasis in original).

[67]     *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[68]     *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

that were severe but not severe enough to meet or medically equal a listed impairment. The Fifth Circuit Court of Appeals noted that "[t]he ALJ did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment."[69]  The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review."[70]  The court then went on to explain that:

> By the explicit terms of the statute [42 U.S.C. § 405(b)(1)], the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step. Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."[71]

In this case, the ALJ failed to follow the Fifth Circuit's guidelines in evaluating the claimant's impairments, summarily stating that "the record does not establish that the claimant's impairments meet or equal the severity criteria of any listed

---

[69]     *Audler v. Astrue*, 501 F.3d at 448.

[70]     *Audler v. Astrue,* 501 F.3d at 448, quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[71]     *Audler v. Astrue*, 501 F.3d at 448, quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

impairment."[72]   The ALJ then went on to say that the "claimant's counsel did not argue that any of the claimant's impairments met or equaled any listed impairment."[73] The evidence in the record does not support that statement.  The record is replete with documentation of the claimant's medical conditions, particularly his coronary artery disease.  The record includes evidence establishing not only a quadruple bypass surgery but at least five additional invasive coronary procedures in five years. Certainly, the ALJ should have compared Mr. Darby's symptoms and test results with the criteria for Listing 4.04 – ischemic heart disease.  But the ALJ did not mention that listing or explain what listings she considered or how she reached the conclusion that Mr. Darby does not meet or equal them.

In accordance with the Fifth Circuit's reasoning, the Commissioner's step three determination in this case was not reached through the application of proper legal standards and the undersigned is unable to determine whether the Commissioner's conclusion at step three is or is not based on substantial evidence.  Because the ALJ failed to compare the claimant's symptoms with those of relevant listings, remand is required.[74]  Therefore, the undersigned recommends that this matter be remanded for

---

[72]      Rec. Doc. 6-1 at 22.

[73]      Rec. Doc. 6-1 at 22.

[74]      See, e.g., *Reyna v. Colvin*, No. 5:14-CV-147-C, 2015 WL 1515251, at *4 (N.D. Tex. Apr. 1, 2015); *Marsh v. Comm'r of Soc. Sec. Admin.*, No. 4:13CV312, 2015 WL 1288656, at *3

a thorough analysis of whether Mr. Darby has an impairment or combination of impairments that meets or medically equals a listed impairment.

## B.   THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY

Mr. Darby assigned two errors related to the ALJ's evaluation of his residual functional capacity.  First, he argued that the ALJ erred in finding that he can perform the full range of light work; second, he argued that the ALJ erred in finding that he can sustain work-related activities.  If the claimant has an impairment that meets the criteria of a listed impairment, he will be deemed disabled without the necessity for a residual functional capacity evaluation between steps three and four.  Because the ALJ's analysis at step three was flawed, the undersigned pretermits discussion of the claimant's residual functional capacity pending remand of this matter.

## C.   THE CLAIMANT'S ADJUSTMENT DISORDER

The claimant argues that the Commissioner's ruling is flawed because the ALJ failed to find that his adjustment disorder is severe.  The claimant is correct that an impairment is considered to be not severe only if it is a slight abnormality having such minimal effect that it is not expected to interfere with an individual's ability to

---

(E.D. Tex. Mar. 20, 2015) *Watson v. Colvin*, No. 3:13-CV-583-BF, 2014 WL 1281473, at *4 (N.D. Tex. Mar. 31, 2014); *Joseph v. Astrue*, No. 6:10-CV-01315, 2012 WL 601477, at *6 n. 74 (W.D. La. Jan. 24, 2012) report and recommendation adopted, No. 6:10-CV-01315, 2012 WL 601586 (W.D. La. Feb. 22, 2012); *Robertson v. Astrue*, No. 3-10-CV-1669-BD, 2011 WL 3836915, at *4 (N.D. Tex. Aug. 26, 2011); *Lynch v. Astrue*, No. 7–10–CV–0032–BD, 2011 WL 1542056 at *3–4 (N.D.Tex. Apr.22, 2011).

work.[75]  But Mr. Darby did not establish that his adjustment disorder has more than

a minimal effect on his functionality.  The only evidence in the record concerning this

impairment is found in the psychological report[76] prepared by clinical psychologist

Dr. David E. Greenway, which is based on his evaluation of Mr. Darby on July 7,

2011.  Dr. Greenway diagnosed Mr. Darby with "Adjustment Disorder w/ Depression

– Mild."[77]  Although Dr. Greenway recognized that Mr. Darby would likely persist

at a slow pace over the course of a routine 40-hour work week, his opinion was that

Mr. Darby's mental condition would not prevent Mr. Darby from engaging in

competitive employment.[78]  The record contains no evidence refuting Dr. Greenway's

opinion.

The claimant also objects to the ALJ's reliance upon the "paragraph B" criteria

in making her decision.  While it is correct that the ALJ failed to identify any specific

listing for mental impairments and failed to compare Mr. Darby's symptoms with the

criteria of any particular listing, the ALJ expressly and accurately explained that the

regulations for evaluating mental disorders and the listings for evaluating mental

---

[75]     *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

[76]     Rec. Doc. 6-2 at 108-110.

[77]     Rec. Doc. 6-2 at 110.

[78]     Rec. Doc. 6-2 at 110.

disorders require an analysis of the functional categories set forth in Paragraph B. The ALJ also expressly explained that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3."[79]  She also explained that her "residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."[80]  Thus, the ALJ's proceeding directly to an analysis of the paragraph B criteria was harmless error.  Even if she had properly identified a listed impairment, she would have had to use the paragraph B criteria to analyze the severity of that impairment.  Accordingly, use of the paragraph B criteria to evaluate Mr. Darby's mental impairment was not inappropriate  Although the procedure used was flawed, the result was valid because there is no evidence in the record that Mr. Darby's mental impairment is severe.  Accordingly, this assignment of error lacks merit.

## C.    THE CLAIMANT'S NON-SEVERE IMPAIRMENTS

The claimant's next argument is that the ALJ erred by failing to properly consider the effect of his non-severe impairments on his ability to work.  The Commissioner is required to consider the effects of a claimant's severe impairments

---

[79]     Rec. Doc. 6-1 at 22.

[80]     Rec. Doc. 6-1 at 22.

and also to consider the combined effect of a claimant's severe and non-severe impairments. Mr. Darby complains that the ALJ failed to discuss his "sleep apnea, back condition, diabetes, pulmonary problem. . . or his chronic fatigue."[81] He suggests that the combination of his severe and non-severe impairments "explain his need for daily rest periods. . . and his inability to sustain work."[82]

This argument lacks merit. The ALJ found that Mr. Darby's lumbar spondylosis, diabetes, and sleep apnea were all severe impairments, and she discussed in detail her reasoning concerning his non-severe adjustment disorder. The only problems that Mr. Darby cites that were not addressed by the ALJ are his pulmonary problem and his chronic fatigue. But Mr. Darby presented no medical opinions concerning those conditions or how they affect his ability to work. Therefore, there is no substantial evidence in the record that might be relied upon to reach the conclusion that Mr. Darby proposes. Accordingly, Mr. Darby has not demonstrated that the ALJ erred by failing to properly analyze his non-severe impairments.

## D. THE ROLE OF THE VOCATIONAL EXPERT AT STEP FOUR

The claimant's final set of arguments concern the vocational expert that testified at the claimant's hearing. First, the claimant argues that the ALJ erred by

---

[81]      Rec. Doc. 10 at 11.

[82]      Rec. Doc. 10 at 11.

relying on the vocational expert ("VE") at step four of the evaluative process.  To determine whether a claimant can perform his former work, the ALJ is required to assess the physical demands of the claimant's prior jobs.[83]  "Although the testimony of a VE is not required to make a step 4 determination, an ALJ may utilize such expert testimony [at that step]."[84]  Vocational experts are familiar with job requirements and working conditions.[85]  More particularly, vocational experts know the specific requirements of various occupations as well as the attributes and skills needed by persons employed in those occupations.[86]  When a vocational expert provides evidence about the requirements of a job, (1) the ALJ must ask the VE if the evidence he has provided conflicts with information provided in the Dictionary of Occupational Titles ("DOT"); and (2) if the VE's evidence appears to conflict with the DOT, the ALJ must obtain an explanation for the conflict and determine whether the VE's explanation is reasonable and provides a basis for relying on the expert testimony rather than the DOT.[87]

---

[83]      *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990)

[84]      *Escatel v. Colvin*, No. 3:14-CV-02517-B-BK, 2015 WL 2379113, at *5 (N.D. Tex. May 18, 2015).

[85]      *Vaughan v. Shalala*, 58 F.3d at 132.

[86]      *Vaughan v. Shalala*, 58 F.3d at 132.

[87]      SSR 00–4p, 2000 WL 1898704, at *2, 4 (S.S.A. Dec. 4, 2000).

In this case, Mr. Darby suggests that the ALJ erred in failing to ask the VE to resolve the apparent conflict between the DOT's classification of a freezer operator as light work and Mr. Darby's actual former employment as a freezer operator and plant manager requiring medium work.  But the VE did explain that the job as described in the DOT requires lifting a maximum of twenty-five pounds, while Mr. Darby's actual jobs required him to lift heavier weights.[88]  A determination of whether a claimant can do his or her past relevant work may rest either on descriptions of past work as actually performed or as generally performed in the national economy.[89]  In this case, the ALJ expressly found that Mr. Darby is capable of performing his "past relevant work as a freezer operator and a factory manager **as performed in the national economy**."[90]  Therefore, the procedure used by the ALJ was not erroneous.

Mr. Darby also argues that the ALJ ignored the VE's responses to hypothetical questions asking whether missing work two or more days a week or needing to rest for an hour or two or more days a month would make the claimant unemployable. The VE opined that such rest periods or absences would negatively impact a

---

[88]    Rec. Doc. 6-1 at 73-74.

[89]    *Alexander v. Astrue*, 412 Fed. App'x 719, 722, n. 3 (5th Cir. 2011); *Khawaja v. Shalala*, 20 F.3d 1170, at *3 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d at 1022.

[90]    Rec. Doc. 6-1 at 26 (emphasis added).

-24-

claimant's employability.[91]   Mr. Darby claims to be confused as to whether these questions were relevant only to step five of the sequential analysis or were useful to but ignored by the ALJ at step four.  Hypothetical questions are usually used at step five of the sequential process, but the ALJ did not progress that far in this case. However, the claimant's suggestion that "[b]y raising this issue to the VE, the intent was to consider those impairments recognized as legitimate by the ALJ. . . ."[92] is misplaced.  It is clear from the ALJ's ruling that she found Mr. Darby's complaints about the frequency and intensity of his chest pain and shortness of breath to lack credibility and, more generally, she also found his testimony regarding his abilities lacking in credibility.  The ALJ has broad discretion to make credibility choices.[93] Because the ALJ found some of Mr. Darby's subjective complaints to lack credibility, it follows that she found his claim that he required rest periods and frequent absences to lack credibility as well.  Therefore, the hypothetical questions concerning absences and rest periods were not material to her analysis of Mr. Darby's disability status. Accordingly, the ALJ did not err in failing to credit the opinions provided by the vocational expert in response to the hypothetical questions.

---

[91]      Rec. Doc. 6-1 at 75-77.

[92]      Rec. Doc. 10 at 13.

[93]      *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).

## CONCLUSION AND RECOMMENDATION

The undersigned finds that the ALJ applied an inappropriate legal standard in making a determination at step three of the evaluative process.  Accordingly,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **REVERSED** and **REMANDED** for further administrative action under sentence four of 42 U.S.C. § 405(g), specifically for the purpose of determining whether the claimant's heart disease is an impairment that meets or medically equals a listed impairment.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds

of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d
1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 30th day of June 2015.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE


COPY SENT:

DATE: ___6/30/2015___
BY: _____EFA_____
TO: _____RFD_____
          cg

-27-